United States Mr. Borski, am I pronouncing that correctly? Actually, it's pronounced Braski. Braski. Braski. Okay, thank you. Good morning. My name is Ken Braski and I'm counsel for the taxpayer appellants. This case involves one of the most fundamental and foundational concepts of federal tax law. It affects just about every individual taxpayer in this country because they report on the cash receipts, the cash method of accounting. And the question in this case is when income is to be reported under that method of accounting. There's a lot of water over the dam here. Three federal circuits, the 4th, 7th, and 11th circuits, and several other district courts have considered this matter. How is your case different from the cases that were considered in the 11th and 7th circuits? I think because both the facts and the law as considered by those circuits are incorrect. Well, that doesn't make them different. It's the same case, isn't it? It's the same case, but maybe the understanding of what was really going on here was not properly conveyed. I argued the 7th circuit case, and I think properly it should have gone to reconsideration, but that was prohibited by other circumstances. What did that mean? Cindy Fletcher, between the time of the decision and the time for reconsideration, went back with Ernst & Young. She was advised that there might possibly be the potential of a conflict of interest if she were to pursue. None of this is in the record, right? No, it is not. So you're saying you never thought we're hearing on bond? Did not. Okay. No. So why – the 4th circuit rejected an identical claim based on a variant of the Danielson rules. Yes. So why doesn't the Danielson rule apply here? We have a situation, do we not, in which Capgemini got a higher amount of amortization, depreciation deduction, as a result of treating this as constructive receipt. That's correct, right? That is correct, yes. So you have a situation in which the party's characterization of the thing as involving constructive receipt immediately led to a tax benefit to Capgemini, and now you're trying to recharacterize the transaction at a time when perhaps the statute of limitations has run on any government challenge to the amortization by Capgemini, right? Well, except, Judge, that the parties didn't agree that this was constructive receipt. No, no, but is my statement correct? I mean that you are asking to recharacterize the transaction at a time when the statute of limitations may have run on any government challenge to the amount of Capgemini amortization, correct? Yes, but there are some circumstances that aren't readily apparent with respect to the running of that statute of limitations. The bottom line is the form of the transaction here is not something that is in dispute. We aren't challenging or changing the form of the transaction. Well, I don't think in Danielson and these other cases they're necessarily changing the form of the transaction. It's just a question of they're saying for tax purposes we're allocating so much to the hard assets and so much to the covenant not to compete, and they're trying to recharacterize it. I don't think that solely for tax purposes in the Danielson context doesn't have any consequences for the reality of the transaction, does it? Well, there wasn't an agreement here as to what the allocation should be. In fact, I don't even believe that's part of the record in this case. Well, there was an agreement that it would be treated as immediately received, right? No, sir. No? Absolutely not. Now I'm confused. I thought there wasn't a dispute that the agreement required your client to treat this as constructively received and file tax returns on that basis. Absolutely not.  Explain that, would you? There is nothing in the agreement stating an agreement to constructive receipt or an agreement to report the full receipt of the capgemini stock in 2000. There is nothing in this record that indicates that. There is no agreement by the taxpayer that that's so. In fact, that is the issue in the case, because the form of the transaction is, and the facts of the contract themselves, are that there was no receipt. That is the contention here. And they erroneously reported it as having been received when they initially… You're arguing that there was no receipt, either actual or constructive, but my recollection is that the agreement instructed the consultants to treat those interests as taxable income in the year 2000. I believe there's no provision in the contract that so states. That appears in the partner information document, though, right? The partner information document is not a transactional document. It was a document drafted by the legal staff of Ernst & Young, specifically repudiated by Capgemini, and the master agreement expressly says that no one will rely on it. But wasn't that part of the purpose of the transaction, in order for there to be a clean break and a separation between the auditors and the consultants, was that there had to be this clean break, and part of that would be the receipt of these interests in a particular taxable year? That is the contention that the government is making. It's also the finding of the Court of Federal Claims, isn't it? It is the finding of the Court of Federal Claims, and I believe it's an incorrect finding, yes. You started out by saying that you thought these other cases, and presumably our Court of Claims, got things wrong both legally and factually. So what factually… I certainly understand that you think that they interpreted the facts inappropriately, but what factually did they just get wrong? I think if we start with the essence of what was going on here, I can put this in context and explain to you why that's so. This is a power situation, and let me describe what I'm… I'm not big on essence. We just like the facts. Okay. So what factually, what facts that the Court of Claims found or stated do you believe are just wrong? Well, the fact that they didn't find is that the bulk of what was being bought by Capgemini here was something that could only be transferred over time. In other words, Capgemini was not just purchasing the ownership interests of the former consulting practice of Ernst & Young. That indeed was transferred at the May 23, 2000 closing date of this transaction. But as Arthur Gordon, who was the designated spokesman for Capgemini and who also was the director of taxes for Ernst & Young, just prior to the closing of the transaction became the director of taxes for Capgemini just after the transaction closed. As he made absolutely clear, the predominance of what was being purchased was the personal goodwill of each of the consulting partners, their connections, their knowledge, the workforce in place. And those were to be transferred to Capgemini over the four-plus-year period that they were to receive the Capgemini stock. Well, they had the right to all of that on the date of the closing, right? I'm sorry? They had the right to that on the date of the closing. Capgemini did. And the problem is that that goodwill could only be transferred by the time of them being with Capgemini over that four-year period. The whole idea was their personal goodwill, the workforce in place, their contacts, everything else, over that five-year period would ultimately accrue, of course, to Capgemini. But not on the date of closing. When you bring goodwill to a company, I mean, you bring it on the very first day that you're there. If I'm hired by a particular company and I show up to work and I'm there for 20 years, the goodwill that I bring to that company, it's not allocated over a 20-year period, is it? No, and I would agree, Judge, that you do bring that goodwill when you first come. But the point is what was being paid for is the effective transfer of that goodwill over time. If that partner were to have left two days after the closing, that goodwill goes with that partner. And the whole point here is… I don't follow that. The goodwill goes with the partner. I mean, it may be that it seems to me that it's not a question of the goodwill not being transferred. It's a question of you're saying that what was going on here is that they were bargaining to keep the employees at Capgemini by providing for a forfeiture if they didn't stay. No. In fact, as Arthur Gordon himself characterized it, if they left early, the goodwill that they were bringing was not effectively transferred to Capgemini. And in fact, and this is a key point, the purchase price to be paid by Capgemini was retroactively adjusted each year after 2000 as these forfeitures occurred. They kept changing the purchase price because the purchase price couldn't be known until you knew how much goodwill was going to be transferred. If they left after year one, less goodwill was transferred. And so accordingly… The purchase price couldn't be determined until they determined how much stock was ultimately forfeited. Exactly. Don't you see a difference between vesting over time and vesting subject to forfeiture over time? Well, and it's interesting that you mentioned the word vesting because that appears nowhere in the contracts. It would have been very easy to say that it all vests in 2000. Well, look at page B124. I'm sorry. B124 of the appendix. Appendix B124? Correct. Thank you. And in the middle of the page there, it says that… I was just talking about a filing of a tax return for NUCO. Is NUCO Capgemini? Yes. Yeah. So it says it would reflect the ownership by NUCO by MADOC-US and the accredited partners on that day. So am I misreading that? It seems to be that they're supposed to reflect the fact that the ownership of the accredited partners of the stock on that day. Am I misreading it? The ownership of the accredited partners was transferred of their… They transfer all of the ownership interests of the former Ernst & Young consultant practice. Yeah, but isn't… NUCO… What I'm asking is, isn't this saying that the tax return is supposed to reflect the ownership of NUCO by the accredited partners on that day, the extent that the accredited partners own NUCO stock? Yes. And they transferred, indeed, that stock to Capgemini. So that seems to be saying that it's to be treated as though they owned it on that date, not at some future date. The ownership of the stock, yes, absolutely. But there was another thing being transferred here. And that's what Arthur Gordon was emphasizing in his testimony. Not just the ownership of the former consulting practice interests, but the personal goodwill of each one of the consulting partners. I mean, if they own the stock, if they're treated as owning the stock in 2000, then what they reported on the tax return was correct, no? No. Why not? What they, the consulting partners, reported on the tax return? The accredited partners, which includes your client, right? Yes. So if they were treated as owning the stock on that date in 2000, there was constructive receipt on that date, no? NUCO is not Capgemini. I thought you said it was. I'm sorry. NUCO was purchased by Capgemini. NUCO was the created vehicle into which all of the stock by both the Ernst & Young tax and audit and consulting partners, they put all their stock into NUCO. NUCO was then transferred to Capgemini on the closing date of the transaction. That clearly occurred? NUCO ceased to exist as of the date of the transaction. Well, it became a wholly owned subsidiary of Capgemini because it was Capgemini, Ernst & Young. That was the name of NUCO. Can I just ask one more question? So we've tried to go over the facts, but so legally, what is it that you believe? Well, first of all, you disagree, I take it, with the Danielson argument as the Fourth Circuit applied it? Yes. So what is it that you disagree with with respect to the Seventh Circuit, Eleventh Circuit, and the Court of Federal Claims decision from a legal standpoint? From a legal standpoint, the purchase price here was in no way fixed in the year 2000. It was adjusted each year after 2000 retroactively by Capgemini. Capgemini is an accrual basis taxpayer. It's governed by the all events test set forth in the Treasury Regs under 446, which says all events have to have occurred, which fixed the fact of the liability, and the amount is determinable with reasonable accuracy. By definition, that wasn't so. None of this is in your brief. Yes, it is. Where is your reference to the all events test in your brief? Oh, there isn't a reference to the all events test in my brief, but there is clearly a reference in my brief to the fact that the purchase price was being adjusted retroactively by Capgemini for every year after 2000, which means that by definition, there was no fixed and determinable purchase price in the year 2000. Nevertheless, Capgemini took this deduction, and we're talking about somewhere in the range of, it's the bulk of an $8 billion deduction that we're talking about. This was the 600-pound gorilla in this. The Department of Justice and the Internal Revenue Service… The deduction that you're talking about is the amortization. Of goodwill. Yes. Goodwill that, at that point, at the point of the transaction, was not known because it was continually adjusted, and every year after that. This wasn't a done deal in the year 2000. Yeah, I think Judge Reina has a question. Yeah, just real quickly, and this goes back to my first question, and I guess it builds on Judge O'Malley's concern. It seems to me that under the regulation at play here, 1.451-2A, it seems that the narrow question that we're looking at with your case is whether Capgemini stock is a restricted account or any of the contents constitute an amount realized by the tax by your client in 2000 as being actually or constructively received in the year 2000. That's the issue that's before us. That is the issue. Okay, I've looked at the other cases, at the 11th and the other circuits that have heard this case, and it appears to me that that was a very same issue in those cases as well. It was. And you argued in one of those, the 11th Circuit case? 7th. 7th Circuit. Yes. So you made those same arguments in the 7th Circuit that you're making before us today? And I was involved in the briefing of the 4th and the 11th, yes. I don't hear you. Thank you, Mr. Ruski. We'll give you three minutes for a moment. Ms. Tamami, am I pronouncing that correctly? It's Tamami. Very close. Thank you. Good morning. May it please the Court. I'm Francesca Tamami, Counsel for the United States. First, I'd like to address a question I guess I heard raised a few times. There is no difference between this case and any of the other cases that were decided either factually or legally. The facts are identical in the other cases in all material respects, and all of the legal arguments that have been made by the taxpayer in this case have been made in a variety of – in all of the nine cases that have been considered. And the government has prevailed unanimously in each of these cases. Does the fact that we have patent on the books here change that? I don't think so, because I think if you look at patent – actually, the court in patent distinguished a situation that is more akin to this case than the issue that was addressed in patent. Patent dealt with a situation where the question was whether the taxpayers had received corporate dividends. So, first of all, it did not involve a sale or exchange of property governed by Section 1001, which is the operative tax provision here. In that case, there was a different regulation that governed that question. It was somewhat similar to the constructive receipt regulation, but I think the standard is actually higher if you look at the language. It says that a taxpayer has received a corporate distribution if the proceeds are made unqualifiedly available to him or to his demands. In that case, the court looked at the fact that, I guess, the dividend was paid in the form of certificates of deposit that were issued in the taxpayer's name, but they were retained by the issuing bank. So there was no actual receipt of the dividends in contrast to the situation here? Correct. This court in the patent case observed that it was unlikely whether the CDs would ever actually be transferred to the shareholders because they were being held as collateral for the corporation's loan, and the corporation was practically insolvent at that point. It had only – A distinction that the corporation had control over the subsequent events? I think just looking at the balance of the factors, the shareholders had very little control over whether they would actually receive the proceeds. In this case, the circumstances – So it wasn't a situation where it was being held to guarantee performance by the shareholders? Correct. And the shareholders had no control over whether those contingencies would be met. That depended on the corporation's financial performance. In this case, the – The problem is that that distinction doesn't appear in the language of the regulation, does it? Well, I think the language says you look at the constructive receipt doesn't exist if the taxpayer's control of the receipt of the property is subject to substantial limitations or restrictions. And as the courts that have interpreted that regulation over time and all of the courts that have considered this particular transaction have correctly observed, the essence of the regulation is control. So you look at what are the various factors indicating control. The court in the patent case distinguished a situation – It was the Seren case from the Seventh Circuit where the taxpayers received checks from the corporation, a corporate dividend, but then they had a contractual agreement with a third party to immediately return that money to the corporation. And this court distinguished that situation and said that's fine. In that case, they did receive the dividend because they voluntarily put themselves under an obligation to return the money. So a voluntary choice to dispose of property in a certain manner doesn't defeat receipt of that property in the first instance. So does that mean that we have to conclude that all of these restrictions that were placed on the partners with respect to their future performance were voluntary decisions on their part? I mean, is that the assessment that we have to make? Well, in this case, the consulting partners accepted the stock. They received the stock and accepted the stock with those conditions. Those were conditions that were put – or not conditions, actually. They were – none of this was termed as a condition precedent to receipt. They did immediately – Capgemini immediately delivered all of the stock. And then in the transaction documents, the partners agreed to basically two restrictions on the stock. One was not to sell the stock until scheduled offerings. And the testimony is that that was done to protect the value of the stock because the market in France where the stock would be sold in a smaller market, and if the market was flooded with shares, the stock price would decrease. So one was a restriction on transfer. And then the second was the forfeiture provision, which basically said if you breach your employment agreement or are terminated for cause of poor performance, then you may forfeit your stock. It was specifically called a forfeiture provision. It was specifically called a liquidated damages provision. It was not a condition precedent, and it was not called a vesting schedule. But do we have to conclude that the partners were essentially in control of whether those forfeitures would occur in order for us to find that it doesn't run afoul of the regulation? I don't think – well, I think here the evidence is that they did have control over whether they would force itself. But the answer is yes, isn't it? Yes, but I don't think that's the only factor that argues in favor of finding constructive receipt here. I don't think the case basically follows – What are the other factors? Well, the fact that the contractual agreement specifically provided for delivery of all of the stock at the closing, and that is what actually happened. The stock actually was transferred to a Merrill Lynch account in the taxpayer's name. It wasn't merely credited on Capgemini's books. It wasn't actually doled out to Merrill Lynch in tranches over the years. It was all put in an account in the taxpayer's name. He bore the sole risk of increases or decreases in the value of the stock. He received dividends on the stock. He was able to sell the stock. Apart from the dividend distinction, the other things were true in patent too, weren't they? No. The certificates of deposit were not set apart or made available to the shareholders. They were kept by the issuing bank. Here the stock was not – So we're talking about where the stock physically was located as being a significant factor? Well, that's one of the factors. That's one of the factors. But here the consultants did not receive the actual stock certificates, did they? The contract didn't provide for actual delivery of stock certificates. The contract provided for delivery of the stock by electronic book entry, and that's what happened. And if you look at the Merrill Lynch brokerage statements that are in the record, they reflect – So isn't that similar to under Penn where the certificates never left the custody and control of the bank? Here they never did have custody and control over the certificates. They had a confirmation letter that was accredited to the account, but not the certificates. But they – I mean, I don't know, frankly, in this day and age, if physical actual stock certificates are actually transferred in modern business deals. I think most of this is done by electronic book entry, and that's what was done here. And unlike patent, the stock went to basically – the Merrill Lynch account could be analogized to an escrow account. It didn't remain with Capgemini. It wasn't just a book entry on Capgemini. I don't see what the benefit of the electronic transfer to them was. They didn't give any more or less control over it as a result of the electronic transfer. It was still restricted. That's correct. I guess the point I'm making is that this is one of the factors indicating their receipt, that the stock was not kept – Capgemini explicitly disclaimed any legal or beneficial ownership of the stock in the contract. The contract provided for delivery of all of the stock at the closing, and that happened in the manner provided for in the transaction document. Had the taxpayer called Merrill Lynch and said, that's it, I want out, let me have all my money, would Merrill Lynch have been obligated to respond? He could not have done that pursuant to the contract that he signed. Isn't that similar to what we have in patent, where the bank could not have exceeded to demand from the individual for delivery of their interest? But that wasn't a disability that the shareholders voluntarily put themselves under. In patent, there was no contract. It wasn't exactly voluntary here in the sense that at the date of the transaction, the shareholders couldn't walk away from the stock and say, well, we're not going to put it in – we're not going to agree to be subject to these restrictions. The only way they got the stock was to agree to be subject to the restrictions, correct? That's correct, but they made that decision when they voted in favor of the transaction. Yeah, but the result of not voting in favor is they didn't get the stock, right? They wouldn't get the stock, but they could stay with Ernst & Young. They could resign and get their capital account, and the record shows that some chose to do that. All of the courts that have considered this transaction have unanimously rejected the suggestion that the partners didn't have any real bargaining power. The evidence in the record is that the consulting partners were the most profitable segment of Ernst & Young at that time, generating over 40% of the firm's revenue. The taxpayer in this case – You've got to admit that there's a big difference between a situation in which they were given the stock and they could voluntarily decide whether to put it into the escrow account and subject to the forfeiture provisions in a situation where they couldn't. And this is a situation in which they couldn't. They didn't have the ability to walk away with the stock and say, we're not going to put it into the escrow account, right? That's true. That would be the difference between actual receipt and constructive receipt. If they'd been able to immediately demand the stock, then they would have actually received it. And the government's not arguing that there's an actual receipt situation in this case. Our argument is that the courts are correct in finding constructive receipt based on the various factors. And one other factor I'd like to mention that I haven't had just a chance to get to yet is the fact that even if the stock was still subject to the forfeiture provisions, they could sell that stock. The cash was then held in a restricted account, and if a partner left and had to forfeit something, they would forfeit the cash instead. I'm not aware of any case where you can sell stock that you don't actually own. Could I move you to the Danielson issue? Yes. Diane, you heard the discussion with Mr. Busbee earlier, and I think we're struggling with the question of whether the partners, such as Mr. Hartman, were obligated to report on their tax returns the receipt of the stock in the year 2000. Could you help us with that, please? Yes. I can point you to the provisions in the master agreement that provided for delivery of all of the stock at the closing and the tax consequences are on pages B43, 46, and 47. The point is to the actual language. Well, the master agreement itself doesn't say you shall report all of this on your 2000 tax return. The master agreement provides for all of the delivery of the stock at the closing and provides that it shall be treated as a taxable sale. Now, the consequence of that under section 1001 of the tax code is that you have to report all of the gains. Where does it say it has to be reported as a taxable sale? Let's see. That's in section 7 of the master agreement. I'm just flipping through here. I think this is, let's see, B121. Yeah, the 7.7F was the setting forth the tax consequences, B121 and 122. I'm sorry. Let's see. I know it was stated in sort of plain English in the partner information document. Was that binding on them? Pardon? Was that binding on them, the partner information document? The partner information document in the other transaction documents was not defined as being one of the transaction documents, but in those documents it said that the, provided for the consulting partners to rely on that in making the decision. But do you disagree that Capgevini at least partially repudiated those documents? That's not true, and I'm not really sure where that argument comes from, because if you look at, it's 624 of the appendix, and this is the consulting partner transaction agreement. It says, it acknowledges, you have read the partner information document in the transaction documents. You are not relying on any material oral or written representation, which is not contained in the partner information document or the transaction document. So the partner agreement expressly allows them to rely on the partner information document, even though it wasn't technically defined as being one of the transaction documents. I'm not aware of Capgemini ever disavowing the partner information document in any way. Well, perhaps rather than our sitting here and trying to go through this rather complicated agreement, each of you could provide a letter describing your position as to why the agreement did or did not obligate the partners to report this as having been received in the year 2000. I'd be happy to send such a letter. Laura, why don't we give you, let's say, a week from tomorrow. Does that give you enough time? That's fine. And why don't we say that, limit it to five pages each. Mr. Roski, does that give you enough time? Yes. Does it have to be single-spaced? We'll give you ten pages double-spaced. Sorry. I just want to make one final point before my time has expired. The issue of vesting, I heard my opposing counsel say the documents don't speak to the vesting at all. The partner information document on page 721 of the appendix does provide that. It says explicitly the partners will vest in their shares immediately upon closing. Which says that? It's the partner information document, page B721 of the appendix. Well, that's the thing they say is not binding. I understand that. You need to address that question of whether the partner information document is binding on your submission. Okay. Okay? Thank you. Thank you. Thank you. Pardon, Chair. Expressly, under the agreement, couldn't sell anything. Not only could they not sell it. They couldn't, quote, directly or indirectly sell, assign, transfer, pledge, grant any option with respect to, or otherwise dispose of any interest in it. Counsel's statements about their ability to sell stock and not be charged with the taxation of it is simply erroneous. They had no ability to do so. If Capgemini said. But the point is that they voluntarily had no ability to do so. Isn't that right? I mean, it was to their benefit not to have, because to the extent they agreed not to sell their shares right away, they prevented everyone else from selling their shares right away and tanking the stock. But Judge, this isn't just a, voluntarily, I don't agree with. But this isn't just you can't sell your stock. It's you can't in any way access that value. Are you relying on the inability to sell as avoiding constructive receipt? Or are you relying on the forfeiture provisions as avoiding constructive receipt? Well, both. But the inability to do anything with that stock. But you say they couldn't borrow against it, for instance. Where in the documents is that found? That's expressly in the. Let me see if I can find the reference very quick. Because you don't cite to any reference in your brief. Oh, okay. Well, if you don't have it, I don't want to use up all your time. And by the way, with respect to the PID, that's on page 13 of my opening brief. And footnote eight is all the citations that show that Capgemini repudiated it, that the master agreement says no one will rely on it. The master agreement here, which is the governing transactional document. Let me see if I can find that other reference. You can move on. We'll find it. Okay. I believe it is in there. Very significantly and importantly here, the transactional documents expressly exclude the taxpayer and all of the consulting partners from the category of shareholder. They were not signatories to the shareholder's agreement that was signed by all actual shareholders. And while the transactional documents acknowledge that all stock was to be voted solely by Capgemini, there is no provision in these transactional documents that the taxpayer at any time ever had any voting rights or any say-so as to how the Capgemini stock was to be voted, even before, on, or after the May 23 closing. But that's because they delegated those voting rights to someone else, did they not? That's very interesting. In the, yes. The answer is it says that they're designating someone else. And it says that whoever they say Merrill Lynch is to look to. And you go to the Merrill Lynch agreement, and the Merrill Lynch agreement says that, and this is two weeks before the closing of the transaction, that they irrevocably designate Capgemini as the one who's to vote the shares. I mean, to me, this is reminiscent of Mel Brooks' Young Frankenstein, where, you know, with Igor and Frankenstein says, your hump has changed the other side. And Igor says, what hump? As he's bent over saying this. It's very clear the way this is structured that there never was any voting right. There's nothing in these agreements that says the voting rights are in the owners who are the consulting partners, former consulting partners of Ernst & Young. What it does say is that the voting shall be done by Capgemini. It doesn't say whose voting is being done. Well, they ultimately became Capgemini, did they not? The consulting partners? Yes. No. I mean, they had voting rights as parts of Capgemini, did they not? No. Not in this doc, no. Not even through their designee? There was no designee because of the – and this is outlined in my brief. If you look at Merrill Lynch Agreement and combine it with the – what is it? The CDPR. The only provision that talks about voting rights is – and that I can find. I think we're out of time. Thank you, Mr. Brodsky. Thanks, Jeff. The case is submitted and that concludes our session today. All rise.